**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

JACOB W. CLENDENIN,     )
             )
     Plaintiff,    )
             )
vs.           )  Case No. 16-cv-00601-JPG-CJP
             )
NANCY A. BERRYHILL,    )
Acting Commissioner of Social Security, )
             )
     Defendant.[1]  )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Jacob Clendenin (plaintiff), represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff initially applied for benefits in June 2011, alleging disability beginning on April 10, 2005. An evidentiary hearing was held before Administrative Law Judge (ALJ) Stuart T. Janney, who issued an unfavorable decision on April 17, 2013. (Tr. 20-28). The Appeals Council denied review, and plaintiff filed a timely complaint with this Court, which reversed and remanded the ALJ's decision on June 19, 2015. (Tr. 443-62). The Appeals Council issued an order remanding this case to ALJ Janney, and an additional hearing was held on December 14, 2015. (Tr. 466, 289). ALJ Janney issued another unfavorable decision on February 3, 2016. (Tr. 289-301). Plaintiff exhausted his administrative remedies and filed a timely complaint in this Court on June 2, 2016.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in failing to identify the evidentiary basis of his assessment of plaintiff's RFC.

2. The ALJ erred in evaluating the limiting effects of plaintiff's headaches.

3. The ALJ erred by violating the law of the case doctrine.

## Applicable Legal Standards

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the

claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since his application date. He further found that plaintiff had the severe impairments of Chiari malformation, syringomyelia, hypertension, level III obesity, tremors, and headaches. (Tr. 291).

ALJ Janney held that plaintiff had the RFC to perform light work with physical limitations. Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff could perform jobs that existed in significant numbers in the national economy and was therefore, not disabled. (Tr. 292-301).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms.

The Court previously summarized plaintiff's disability and function reports during its initial review of plaintiff's claim. (Tr. 448-452). In sum, plaintiff alleged the following physical and mental conditions limited his ability to work: Chiari malformation of the brain, syringomyelia, chronic headaches, numbness in feet, severe back pain, back and shoulder spasms, chronic insomnia, dizziness, and vertigo. (Tr. 145).

In 2011, plaintiff reported that he was prescribed Flexeril, Neurontin, Ultram, Vicodin, and a TENS unit. He stated that the syringomyelia and Chiari malformation caused chronic insomnia and migraines. He described chronic pain that prevented him from lifting much weight, inhibited his ability to concentrate, and restricted him to standing, sitting, and walking for thirty minutes. He also experienced uncontrollable back spasms. Plaintiff claimed he suffered from depression as well. (Tr. 148-158).

### 2. Evidentiary Hearing.

ALJ Janney presided over the initial evidentiary hearing in March 2013. (Tr. 450-452). A subsequent hearing following remand was held on December 14, 2015. Plaintiff was

represented by counsel.  (Tr. 209).

Plaintiff held a valid driver's license, which was reinstated on March 28, 2014.  He drove approximately once per month to visit his fiancée, who lived twenty minutes away.  (Tr. 315-16). Driving made plaintiff fatigued and uncomfortable.  (Tr. 329-30).

At the hearing, plaintiff weighed approximately 275 pounds and was five foot, eleven inches tall.  He lost about eighty pounds over the previous year.  The weight loss alleviated some of his lower back pain, but had not "really made much of a difference."  (Tr. 329-30).

Plaintiff lived with his mother, grandmother, and brother.  He occasionally helped his grandmother prepare meals and enjoyed cooking but was unable to cook as often as he would have liked.  (Tr. 318-19).

Since obtaining a medical card three years prior, plaintiff was not prevented from receiving any treatments, consultations, medications, or therapy due to an inability to afford a copay or deductible.  (Tr. 320).

Plaintiff had not worked anywhere since the last hearing.  He did submit job applications in order to remain eligible for SNAP benefits.[3]  Potential employers never contacted plaintiff. (Tr. 321).  He did not believe he would have been able to perform any of these jobs eight hours per day, five days per week, due to his anxiety, depression, pain, and fatigue.  (Tr. 361).

Dr. Schward[4] was plaintiff's neurologist and Dr. Natasha Youngblood was his primary care physician.  Dr. Fox was plaintiff's initial primary care physician but she discharged plaintiff after a nurse failed to note that plaintiff was taking Tramadol, and it appeared on plaintiff's drug test.  Dr. Fox prescribed the Tramadol.  Plaintiff unsuccessfully attempted to contact Dr. Fox to

---

[3] SNAP stands for supplemental nutrition assistance program.  *United States v. Odeh*, 832 F.3d 764, 766 (7th Cir. 201).

[4] This is a phonetic spelling because there are no records from this doctor.  "Dr. Trebetti," who plaintiff refers to later in this section, is also spelled phonetically for the same reason.

offer an explanation. (Tr. 322-24). Plaintiff saw a neurologist, Dr. Trebetti, one time before treating with Dr. Schward. Plaintiff stopped seeing Dr. Trebetti because he did not like his bedside manner and though he was dismissive. Dr. Trebetti suggest plaintiff stop taking all of his medications. Similarly, plaintiff's primary care doctor suggested plaintiff stop taking Norco due to the possibility of developing a tolerance and kidney issues.[5] Plaintiff followed through with his primary care physician's suggestion, but his pain increased significantly. Plaintiff had presented to Dr. Schward four times. During those examinations, Dr. Schward took images of plaintiff's back and head. The doctor recommended pain management via medication. (Tr. 325-28).

Plaintiff was prescribed Flexeril for muscle spasms, Tramadol and Neurontin for nerve pain, a beta-blockers for headaches, and Amitriptyline to help with sleeping and depression. He also underwent injection therapy around 2006 and tried physical therapy and a TENS unit. Plaintiff's medications caused changes in vision, fatigue, dizziness, and problems balancing. He experienced these side effects daily. Plaintiff reported these symptoms to his doctors. (Tr. 329-341).

Plaintiff had "searing" and decreased sensation in his upper back, sensitivity to temperature, and frequent grinding with nerve pain in his left shoulder. The burning and pain made sleep difficult, so plaintiff always felt exhausted. (Tr. 332). He found himself falling asleep throughout the day. His depression and anxiety also contributed to his sleeping problems. (Tr. 357-59). He also developed neuropathy in his fingers and toes, most prominent in his big toes. Plaintiff reported minor numbness and tingling five years before. The neuropathy increased over the previous year and at the hearing plaintiff experienced almost complete numbness in his toes. Plaintiff told his doctors about the neuropathy and underwent deep

[5] It is unclear from the record which primary care physician plaintiff was referring to here.

injections for it. Plaintiff also had nerve pain in his shoulder and spine. (Tr. 334-37).

Plaintiff's depression and anxiety had become "troubling" over the previous year and a half. Plaintiff thought about harming himself in the past. (Tr. 358). He had not treated with anyone for these conditions, Dr. Youngblood had not referred him to anyone, and plaintiff had not requested a referral for treatment. (Tr. 338-39). He had panic attacks as frequently as three times per week and had trouble finding motivation. These attacks persisted for about forty-five minutes. (Tr. 353). They made his tremors worse and made it difficult to breathe. (Tr. 358). He sweated immensely and experienced nausea and vomiting during the attacks. Plaintiff also got tearful throughout the week because of his inability to do things. (Tr. 364). Plaintiff took Bupropion, which was an antidepressant and anti-anxiety medication. (Tr. 340).

Plaintiff no longer experienced cluster headaches after he began taking beta-blockers in January or February of that year, but he did continue to have severe headaches on a regular basis. (Tr. 341). He also had smaller headaches he described as short bursts of pain, lasting anywhere from thirty seconds to twenty minutes. These occurred weekly. The smaller headaches made it very difficult for plaintiff to focus. (Tr. 342). The cluster headaches lasted about one to two minutes and required plaintiff to lay down the rest of the day. (Tr. 342-43). The longer headaches lasted about an hour and brought on sensitivity to light and motion. (Tr. 343). Plaintiff could not go outside without sunglasses, watch television, or look at a computer while having a severe headache. Sounds such as semi-trucks and tornado sirens bothered him as well but he could sometimes tolerate listening to music. (Tr. 344). The headaches could be triggered by stress, pain, fatigue, or dehydration. (Tr. 345).

Aside from the food stamps, plaintiff had no other source of income. (Tr. 335-56). Plaintiff could only do a few dishes and cook simple meals because of his back pain. He could

not do laundry, sweep, dust, or mop. He sometimes went grocery shopping with his brother, but he had issues with crowds. Plaintiff had difficulty with collar buttons, tying his tie, and putting in contacts due to his neuropathy. He also had difficulty shaving. He could only be on his feet for approximately forty minutes at a time, lift less than a gallon of milk, and sit for about forty-five minutes. (Tr. 347-52).

To pass the time, plaintiff read, listened to music, played computer games, and watched foreign films. He played computer games about once a month. There were times when he had to stop playing because he did not feel well. He lacked motivation to play the concertina and guitar, which he used to play often. He could play the concertina about forty-five minutes while lying down. Plaintiff had not built anything for about a year because the small details were difficult to navigate. (Tr. 349-361).

When plaintiff attended John A. Logan College,[6] he was permitted to sit in the back of the class so he could stand without being disruptive and was given more time to get from class to class. He also had access to faculty elevators and note takers. (Tr. 355).

Plaintiff's condition had gotten worse since the previous hearing. His lower back pain was better and the headaches were gone, but his depression and anxiety were very bad and the pain in his shoulder was far worse. His neuropathy also worsened. (Tr. 366).

Ms. Stambaugh, a VE, also testified. The ALJ posed several hypothetical questions regarding a person who could perform light work with various restrictions. The VE testified there were jobs in the national and local economy that such a person could perform. (Tr. 368-72).

### 3. Medical Records

In addition to the medical records already summarized in the Court's previous order, the

_____

[6] The transcript incorrectly refers to John A. Logan College as "Don and Logan College."

following records were submitted after remand.

In May 2008, plaintiff treated with Dr. Jodi Fox for back pain, numbness, and tingling. He also complained of some numbness in his shoulder. She recommended an MRI of his thoracic spine and head. In September 2008, plaintiff reported headaches and parethesias in his upper left extremity. Dr. Fox noted a diagnosis of Chiari I malformation with thoracic syrinx. She recommended an MRI of his head, neck, and spine. (Tr. 603-05).

In August 2012, Dr. Joseph Fonn from Midwest Neurosurgeons reviewed an MRI of plaintiff's thoracic spine and stated the image showed no changes in plaintiff's syrinx or Chiari malformation, which measured at 2mm. A physical examination was "normal" and plaintiff was instructed to return in two years for a follow-up. (Tr. 602).

Plaintiff treated with Dr. Fox several times in 2013 and 2014. Throughout treatment, he reported back symptoms, intermittent tremors in his right hand, cluster headaches, which eventually improved with beta-blockers, and left shoulder pain. Dr. Fox diagnosed plaintiff with syringomyelia and syringobulbia, benign essential hypertension, and tremors. She prescribed plaintiff hydrocodone, Flexeril, atenolol, gabapentin, and tramadol. On March 14, 2014, Dr. Fox wrote to plaintiff stating she would no longer treat him due to the inability "to maintain a satisfactory physician-patient relationship." (Tr. 576-591).

Plaintiff then presented to Dr. Fonn on June 23, 2014 and requested that he take over plaintiff's medications. Dr. Fonn refused, pending a review of plaintiff's medical records. (Tr. 601). In July 2014, plaintiff reported an increase in loss of sensation in his left shoulder and numbness and burning in his back. He also complained of cluster headaches. Dr. Fonn reviewed an MRI of the brain and cervical and thoracic spine from March 15, 2014, and stated that there was no change in plaintiff's syrinx or Chiari malformation compared to an MRI from August

2012.  Plaintiff's Chiari malformation measured 2mm.  (Tr. 599).  Dr. Fonn ultimately refused to refill plaintiff's medications and recommended a course of physical/aquatic therapy.  (Tr. 598).

In August 2011, plaintiff had a physical consultative examination with Dr. Adrian Feinerman.  (Tr. 253–58).  He noted that plaintiff was able to ambulate fifty feet without assistance and had normal muscle strength throughout.  (Tr. 256).  Plaintiff's fine and gross manipulation were normal and he was oriented to person, place and time.  (Tr. 256–57).  His diagnostic impressions were Chiari malformation of the brain and syringomyelia.  (Tr. 257).

### 4.      State Agency Consultant RFC Assessments.

In September 2011, state agency physician Lenore Gonzalez completed an assessment of plaintiff's physical RFC capabilities.  (Tr. 264–70).  She reviewed plaintiff's records but did not examine plaintiff.  She felt plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk, and sit for about six hours in an eight hour workday.  (Tr. 264).  Dr. Gonzalez opined that due to plaintiff's history of vertigo, he should only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and avoid hazards such as machinery and heights. (Tr. 265–67).

### 5.      Dr. Freeman's Opinion.

In March 2013, neurologist Dr. Julian Freeman performed a records review at the request of plaintiff's attorney.  (Tr. 211–14).  Dr. Freeman's diagnoses were Chiari malformation at the base of the brain and upper cervical spine, thoracic cord syringomyelia, morbid obesity, and cluster headaches that may actually be migraine headaches.  (Tr. 212).  Dr. Freeman opined that plaintiff's thoracic syrinx would have several immediate and consequential limitations.  He stated that plaintiff would have intense pain that would be difficult to suppress and would require very frequent changes in posture.  The thoracic syrinx would also disrupt sleep and would cause a

marked impairment in higher cognitive thought, slow responses, and instability of mood and personality. (Tr. 213).

Dr. Freeman stated that plaintiff's headaches would also impose functional limitations. Dr. Freeman opined that the headaches were independent of the syrinx or the Chiari malformation and most likely stemmed from a motor vehicle accident. Dr. Freeman stated migraines would cause impairments of speech, memory, and cognitive function, and the cluster headaches would cause pain and personality changes. (Tr. 213).

Dr. Freeman's RFC assessment was that plaintiff could walk and stand for about two hours and sit for about six hours with incessant shifts in posture and position during a typical work day. Additionally, plaintiff could lift, carry, push, or pull about twenty pounds occasionally and ten pounds frequently with minimal overhead reach. (Tr. 213). Plaintiff would need postural changes of all types with no substantial twisting motion of the spine, and no exposure to more than minimal levels of vibration. (Tr. 213–14). Dr. Freeman stated that plaintiff would have prolonged interruption of all work activities at least once a week for several hours due to his headaches. Plaintiff's mental activities should be limited to simple tasks with limited memory and pace of mental or physical activities due to his sleep deprivation. Dr. Freeman noted that plaintiff would have imprecise and slow spatial organization and arrangement of work objects, tools, and work tasks. (Tr. 214).

## Analysis

The Court first notes that the ALJ held the record open for submission of medical records, but plaintiff did not submit records of Dr. Schward, Dr. Youngblood, or Dr. Trebetti.

The first issue addressed is whether the ALJ provided a sufficient evidentiary basis for his RFC assessment.

Three physicians offered an opinion on plaintiff's physical limitations and each reached a different conclusion. The ALJ found that each opinion was lacking in some sense and did not wholly adopt any of them. Now, plaintiff asserts that the ALJ created an "evidentiary deficit" by rejecting the assessments and impermissibly substituted his own lay opinion for that of a medical expert by crafting his own RFC.

Plaintiff cites *Suide v. Astrue*, 371 F.App'x. 684 (7th Cir. 2010) in support of his "evidentiary deficit" argument. However, in *Suide*, the ALJ erred in not discussing significant medical evidence in the record. The ALJ does not commit this error here and "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The regulations vest the ALJ with authority to determine the plaintiff's RFC by weighing the evidence in the record. 20 C.F.R. § 404.1527. However, an ALJ must not "play doctor" by either rejecting or drawing medical conclusions without relying on medical evidence. *See Dixon*, 270 F.3d 1171, 1177-78 (7th Cir. 2001); *Green v. Colvin*, 204 F.3d 780, 782 (7th Cir. 2000).

Here, the ALJ thoroughly considered the medical record along with plaintiff's subjective complaints and hearing testimony. He weighed the evidence but did not (with one exception, discussed *infra*) impermissibly interpret medical evidence as a layperson.

Plaintiff also contends that the ALJ erred by not explaining how the evidence supported each specific restriction. However, the ALJ must only build a logical bridge that connects the evidence and the conclusions. The ALJ, here, explained,

> [i]n limiting the claimant to light work, the residual functional capacity assessment takes into consideration, the combined effect of the claimant's obesity and tremors . . . some credence is given to the claimant's complaint of pain in determining his exertional capability. In determining the claimant's manipulative capabilities, the assessment considered the claimant's Chiari

> malformation, syringomyelia, and complaints of shoulder problems. The limits on climbing and working around hazards give consideration to the claimant's complaints of balance problems.

(Tr. 299). This explanation, along with the ALJ's discussion of the evidence, permits this Court to traverse the logical bridge.

Plaintiff next contends that the ALJ improperly assessed plaintiff's subjective complaints. Credibility determinations will only be disturbed if they are "patently wrong," *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), which is a "high burden" *Turner v. Astrue*, 390 F.App'x. 581, 587 (7th Cir. 2010).

The ALJ provided a sufficient basis for the credibility determination. He noted the lack of objective evidence supporting plaintiff's claim in the form of unremarkable MRIs and negative examinations, Dr. Fonn's refusal to refill plaintiff's pain medications, and plaintiff's own testimony that his conditions improved. (Tr. 296-97).

Plaintiff also alleges the ALJ specifically erred in addressing plaintiff's complaints of headaches. The record is ultimately unclear regarding plaintiff's symptoms and the treatment he is receiving for headaches. Plaintiff testified that his cluster headaches were resolved with beta-blockers and Dr. Fox's records from 2014 state the same. However, he testified that he still experiences smaller headaches, along with severe headaches. He also testified that he receives treatment for headaches from Dr. Youngblood, his current primary care physician, but plaintiff did not submit any of Dr. Youngblood's records.

The ALJ determined these complaints were not entirely credible because plaintiff had "not been prescribed and does not take medications designed for the treatment of migraine headaches." (Tr. 298). The ALJ provided a sufficient basis for his credibility determination that took into account plaintiff's medications, treatment, and other objective evidence. Thus, the

credibility determination was not patently wrong and will be upheld.

Next, plaintiff asserts that the ALJ failed to consider the aggregate effects of his obesity and failed to explain how the RFC assessment accounted for plaintiff's obesity. The regulations require an ALJ to assess the impact of obesity in combination with other impairments. SSR 02-1p. However, any error in addressing the effects of a plaintiff's obesity is subject to harmless error analysis. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

The ALJ determined that plaintiff's obesity constituted a severe impairment, he noted plaintiff's weight and body mass index in his opinion, and then he opined that obesity would reduce plaintiff's ability to carry and lift. (Tr. 291-98). Moreover, the ALJ relied on medical evidence from physicians who included plaintiff's height and weight in their records in formulating plaintiff's RFC. *See Prochaska,* 454 F.3d at 738 (upholding the ALJ's decision where, although he did not explicitly address the plaintiff's obesity, he predicated his decision upon physician opinions and medical reports noting the plaintiff's height and weight).

Additionally, any error is harmless because plaintiff failed to articulate how his obesity affected his function or exacerbated his symptoms. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (The plaintiff "[did] not specify how his obesity further impaired his ability to work."); *Mueller v. Colvin*, 524 F.App'x. 282, 287 (7th Cir. 2013) ("[A]ny error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled."); *Hisle v. Astrue*, 258 F.App'x. 33, 37 (7th Cir. 2007) ("But the claimant must articulate how her obesity limits her functioning and exacerbates her impairments."). Thus, the ALJ did not err in considering plaintiff's obesity.

Plaintiff next contends that the ALJ erred in dismissing Dr. Freeman's assessment. In evaluating the weight to afford a physician's opinion, an ALJ will consider the examining

relationship, the treatment relationship, supportability and consistency of the opinion, and the physician's specialization. 20 C.F.R. § 404.1527. The ALJ, here, noted that Dr. Freeman conducted a records review. He also explained that the doctor's opinions were extreme in light of other evidence in the record and unsupported. These are legitimate reasons under the regulations for rejecting a physician's opinions and the ALJ's decision will be upheld as long he "minimally articulates" his reasoning. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)

The ALJ also stated that Dr. Freeman's restrictions were consistent with an individual with a cervical spine condition, which is an opinion beyond the expertise of a layperson. However, a remand on this point would not result in a different outcome, so the error was harmless.

Finally, plaintiff asserts that the ALJ violated the law of the case doctrine, which, among other things, requires an ALJ to conform further proceedings on remand to the principles set forth in the appellate court's opinion, absent a compelling reason for departure. *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). Plaintiff argues that the ALJ violated the doctrine because he did not analyze plaintiff's activities of daily living (ADLs). During the initial review by this Court, we held that the ALJ incorrectly equated ADLs to an ability to maintain full-time employment and further opined that "[t]he ALJ's reliance on [plaintiff's] daily activities without further explanation is inadequate." (Tr. 457). On remand, the ALJ mentioned plaintiff's ADLs, but did not lean on them as his primary basis for finding plaintiff not disabled. The ALJ mentioned some of plaintiff's ADLs in support of his adverse credibility determination and explained his reasoning. For example, he stated, "[T]he claimant's testimony that he plays musical instruments such as the concertina tends to indicate that he does have functional manipulative abilities." The ALJ is not required to mention every piece of evidence, *Craft*, 539

F.3d at 674, and the ALJ otherwise complied with the doctrine.

**Conclusion**

The Commissioner's final decision denying Jacob Clendenin's application for social security disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATED:** 6/26/2017

*s/J. Phil Gilbert*

**J. PHIL GILBERT**

**U.S. DISTRICT JUDGE**
